(C.D. 2477)

D. C. McGIEHAN
LANSEN-NAEVE CORP. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 25, 1964)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*John W. Douglas,* Assistant Attorney General (*Richard E. FitzGibbon* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Upon importation from Sweden, certain devices described on the invoice accompanying the entry covered by the above-enumerated protest as "Centralographs" were classified by the collector of customs as time recording mechanisms, valued over $10 each, pursuant to the provisions of paragraph 368(a) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 368(a)), as modified by the Trade Agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832, and duty was imposed thereon at the compound rate of 35 per centum ad valorem plus $2.25 each.

The primary claim of plaintiffs herein is that the articles in controversy should properly have been classified as electrical telegraph apparatus in paragraph 353 of the Tariff Act of 1930 (19 U.S.C.

§ 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for which duty at the rate of 17½ per centum ad valorem is provided. Secondarily, it is alleged that the merchandise in issue should properly have been classified as articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, within the provision therefor in said paragraph 353, as modified, *supra*, and dutiable at 15 per centum ad valorem. A third claim was made for classification of the Centralographs as articles having as an essential feature an electrical element or device in said paragraph 353, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, the applicable rate of duty being 13¾ per centum ad valorem.

Due to the importance to be placed on the primary claim, above referred to, the provision of the statute there involved is set forth below:

Paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra:*

Electrical apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
Telegraph (including printing and typewriting) * * *\_\_\_\_ 17½% ad val.

In addition to the official protest and entry papers, the record upon which this case has been submitted for determination consists of the testimony of one witness who appeared on behalf of plaintiffs and five illustrative exhibits.

At the outset of the trial of this case, counsel for the respective parties stipulated and agreed that the imported merchandise is composed in chief value of metal.

Peter F. Kane, who appeared on behalf of plaintiffs, testified that for 6 months prior to his appearance he had been president of D. C. McGiehan Corp. Prior thereto, the corporation was individually owned by D. C. McGiehan and Witness Kane was employed by him as a sales engineer.

From Kane's uncontradicted testimony the following facts were elicited. The imported Centralographs can be used in any production plant whether it be packaging, bottling, canning, printing, dyeing, or finishing textiles. The purpose of the mechanism is to indicate on a recorder, which is centrally located usually in the plant manager's or production superintendent's office, which machines in a production plant are running, which ones are stopped, and, by reason of the dial feature located in each of the machines in the plant, to let the plant manager or production superintendent know why a machine has stopped. A picture of the recorder referred to was received in evidence as plaintiffs' illustrative exhibit 1. The contacts that send

the electrical impulses from the various machines in the plant to the recorder are illustrated in plaintiffs' exhibit 2. Exhibit 3 is a picture of a telephone dial which is on each machine in a plant using a Centralograph. As many as 20 machines may be handled by the one recorder. The method of communication between the contacts and recorder is an electrical wire connection. The contacts transmit the information from the machines in the plant to the central office equipment where it is received as impulses in the recorder and these impulses in turn are printed by means of a typewriter ribbon and provide the information which eventually appears in the chart on the recorder. An electric magnet causes the levers in the recorder to print through the typewriter ribbon so that lines appear on a chart to indicate whether the machine is operating.

A telephone dial (illustrative exhibit 3) is located on each of the machines in the plant which is being monitored. When a machine in any particular location stops, the operator of the machine dials a number which is transmitted to the recorder and printed on the chart, thus enabling the production superintendent to know why the machine stopped. The figures 0 to 9 appear on the dial and according to a code each figure represents a particular reason for a machine not being in operation. For example, if an operator dialed the figure 1 it might mean, depending on the code, that the machine had an electrical failure. If number 3 were dialed, it might mean that the operator was waiting for material.

As plaintiffs' exhibit 4, there was received in evidence a roll of blank chart paper used on a Centralograph. As plaintiffs' illustrative exhibit 5, there was received in evidence a picture of a chart produced on a Centralograph which illustrates what would be found on a normal chart when a Centralograph was in operation.

Explanatory of exhibit 5, it was stated that where lines appear it is an indication that the machine being monitored has been running, whereas blank spaces indicate that the machine has stopped. The numbers which were dialed to indicate the reason for stoppages also appear. A solid line would indicate that a particular machine was operating at normal speed. The chart is calibrated in time increments of 10 minutes, and red figures on the left side of exhibit 5 show the hours and minutes of time in a day. It was added, however, that any chart paper could be used in the recorder.

From the chart, one could tell the hour and minute at which any of the 20 machines being monitored stopped or started and, by reason of the calibration of the chart, one could also tell the time when it was running and the time when it had stopped. To that extent, a Centralograph does, in a sense, record time. However, Witness Kane stated that the imported mechanism does not record time as such and

that it is not a clock. Government counsel conceded, during the course of the trial, that one could not tell time by merely looking at the chart.

When asked whether a Centralograph has any essential electrical features, the witness replied in the affirmative, stating that it has a motor, rectifier, wiring, and electrical contacts, and that electrical power would be required to operate such a recorder.

From the evidence presented in this case, it seems obvious that the prime purpose of a Centralograph is not to record time as such but to supply information promptly as to whether the various machines being monitored are functioning properly, or have stopped, and the reason for their stoppage, and thus to aid in the efficient operation of a plant.

Plaintiffs in their brief make reference to the definition of "telegraph" appearing in Webster's New International Dictionary and Funk & Wagnalls New Standard Dictionary of the English Language, as follows:

Webster's New International Dictionary, 2d edition 1960:

telegraph 1. orig., an apparatus for communication at a distance by means of preconcerted signals; in the broadest sense, any apparatus, system, or process for communication at a distance other than the ordinary ones of speech, letter writing, etc;—now commonly restricted to those employing electric transmission. * * * of later development are the *printing* telegraph * * * , the *writing* telegraph * * *.

Funk & Wagnalls New Standard Dictionary of the English Language, 1941 edition:

telegraph 1. Any apparatus or device for transmitting messages or signals to a distance, especially any form of such apparatus having electricity for the agent of transmission.

After setting forth the definitions, plaintiffs make the following statement in their brief:

From the foregoing definitions it seems clear that the imported Centralograph does consist of telegraph apparatus since it serves the purpose of transmitting messages or signals from various parts of a production plant to a central office where it records the transmitted information on a chart. It consists of apparatus for transmitting messages or signals at a distance employing electricity as the agent of transmission which is a definition of the term in question.

Defendant contradicts the applicability of the quoted definitions to the apparatus in issue pointing out that—

Both definitions cited by plaintiff state that telegraph is an apparatus for communication or transmitting messages or signals at or to a distance. * * *

The defendant states further in its brief that—

* * * The imported merchandise performs no such function, but only a localized transmission within the confines of a single plant, and it is therefore respectfully submitted that said merchandise does not fall within the common meaning of telegraph apparatus, * * *.

The phrase "at a distance" is a relative one, and while we are not in accord with the interpretation defendant seeks to place upon that term, as applied to telegraph apparatus in a tariff sense, we do not feel it necessary to dwell on the point in view of the statutory language of the provision under which relief is being sought. Not only in the language of paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, but also in the wording of the basic act, provision is made for electrical telegraph (*including printing and typewriting*) apparatus, instruments, and devices.

The record before us which stands uncontradicted discloses that a Centralograph is an apparatus or device for transmitting messages or signals at or to a distance (from the machine being monitored to the recorder in the plant superintendent's office), by a method of operation in the nature of typewriting, and that said apparatus employs electricity as the agent of transmission. (Note Funk & Wagnalls' definition, *supra*.)

The plaintiffs' alternative claim for classification of the apparatus in issue as articles suitable for producing, rectifying, modifying, or controlling electrical energy, within the purview of paragraph 353 of the tariff act, as modified, *supra*, is deemed untenable. When Witness Kane was asked whether a Centralograph performed any of said functions, he replied in the negative, but added that the device contains a rectifier for converting alternate current of 110 to 115 volts to 24 volts direct current which is essential to the operation of a Centralograph. The rectification of energy referred to is evidentally incidental to the functioning of the device and is not the principal function for which it was designed.

Although a second alternative claim was made by amendment to the protest for classification of the imported mechanism as an article having as an essential feature an electrical element or device in paragraph 353 of the Tariff Act of 1930, as modified by the Torquay protocol, that phase of the case was not further referred to by either of the parties. Even granting that a Centralograph measures up to the requirements of the electrical articles provision referred to, nevertheless we are of the opinion that the primary claim of plaintiffs that the imported articles are electrical telegraph apparatus is a more specific provision.

Upon the record presented and for the foregoing reasons, we hold that the Centralograph in controversy should properly have been classified as an electrical telegraph apparatus in paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, and subjected to duty at the rate of 17½ per centum ad valorem, as claimed by plaintiffs. To that extent the protest is sus-

tained.  As to all other claims and all other merchandise, the protest is overruled.

Judgment will be entered accordingly.